U.S. DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
RECEIVED

MAR 0 6 2006

ROBERT H. SHEMWELL, CLERK
BY _____ DEPUTY

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

ALEXANDRIA DIVISION

| | |
|---|---|
| RAYE P. GILCREASE | CIVIL ACTION NO. 04-2329 |
| VERSUS | U.S. DISTRICT JUDGE DRELL |
| COMMISSIONER OF SOCIAL SECURITY | U.S. MAGISTRATE JUDGE KIRK |

## REPORT AND RECOMMENDATION

Raye P. Gilcrease ("Gilcrease") filed this lawsuit seeking judicial review of the Commissioner of Social Security's ("Commissioner") final decision denying her claim for social security benefits. The issue to be decided is whether there is substantial evidence in the record to support the finding of the Administrative Law Judge ("ALJ") that Gilcrease is not disabled.

Gilcrease applied for Supplemental Security Income ("SSI") payments on September 11, 2000, alleging a disability onset date of July 1, 2000, due to heart problems, migraine headaches, hypertension, obesity, asthma, and poor eyesight. (R. 17, 112.) A hearing was conducted by the ALJ on May 2, 2002, at which Gilcrease appeared and testified, along with Thomas LaFosse, a vocational expert (R. 433.) The ALJ denied benefits, but the Appeals Council vacated the decision and remanded the case to the ALJ with instructions to obtain updated medical evidence from Gilcrease's treating sources, evaluate Gilcrease's obesity consistent with SSR 02-01p, give further consideration to

1

Gilcrease's maximum residual functional capacity during the period at issue and provide rationale with specific references to evidence of the assessed limitations, and, if necessary, obtain evidence from a medical expert to clarify the nature and severity of Gilcrease's impairments and obtain supplemental evidence from a vocational expert. (R. 77-78.) The next hearing was conducted on October 23, 2003. (R. 467.) Gilcrease testified at the hearing, as did Wendy Klamm, a vocational expert. The ALJ determined that Gilcrease was entitled to benefits from July 11, 2002, but not before. (R. 24-25.) The Appeals Council denied review, and the decision became the final decision of the Commissioner.

To qualify for SSI benefits, a claimant must file an application and be an "eligible individual" as defined in the Act. 42 U.S.C. 1381(a). Eligibility is dependent upon disability, income, and other financial resources. 42 U.S.C. 1382(a). To establish disability, claimant must demonstrate a medically determinable physical or mental impairment that can be expected to last for a continuous period of not less than 12 months. Claimant must also show that the impairment precludes performance of the work previously done, or any other kind of substantial gainful employment that exists in the national economy. 42 U.S.C. 1382(a)(3).

## Scope of Review

In considering Social Security appeals such as the one that is presently before the Court, the Court is limited by 42 U.S.C. §405(g) to a determination of whether substantial evidence exists in the record to support the Commissioner's decision and whether the decision comports with relevant legal standards. McQueen v. Apfel, 168 F.3d 152, 157 (5th C. 1999). For the evidence to be substantial, it must be relevant and sufficient for a reasonable mind to support a conclusion; it must be more than a scintilla but need not be a preponderance. Falco v. Shalala, 27 F.3d 160, 162 (5th Cir. 1994), citing Richardson v. Perales, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 482 (1971). Finding substantial evidence does not involve a simple search of the record for isolated bits of evidence which support the Commissioner's decision but must include a scrutiny of the record as a whole. The substantiality of the evidence must take into account whatever in the record fairly detracts from its weight. Singletary v. Bowen, 798 F.2d 818, 823 (5th Cir. 1986).

A court reviewing the Commissioner's decision may not retry factual issues, re-weigh evidence, or substitute its judgment for that of the fact-finder. Fraga v. Bowen, 810 F.2d 1296, 1302 (5th Cir. 1987); Dellolio v. Heckler, 705 F.2d 123, 125 (5th Cir. 1983). The resolution of conflicting evidence and credibility choices is for the Commissioner and the ALJ, rather than the court. Allen v.

Schweiker, 642 F.2d 799, 801 (5th Cir. 1981). Also, Anthony v. Sullivan, 954 F.2d 289, 295 (5th Cir. 1992). The court does have authority, however, to set aside factual findings which are not supported by substantial evidence and to correct errors of law. Dellolio, 705 F.2d at 125. But, to make a finding that substantial evidence does not exist, a court must conclude that there is a "conspicuous absence of credible choices" or "no contrary medical evidence." Johnson v. Bowen, 864 F.2d 340 (5th Cir. 1988); Dellolio, 705 F.2d at 125.

## Issues

Gilcrease raises the following issues for review:

(1) Whether the Commissioner erred in failing to obtain a medical advisor to determine the onset date of the claimant's depression;

(2) Whether the Commissioner erred by posing a defective hypothetical question to the vocational expert;

(3) Whether substantial evidence supports the finding that, prior to July 11, 2002, the claimant could perform other work.

## Factual Background

Gilcrease was born in 1961 (R. 133), and filed an application for SSI on September 11, 2000. She claims that she became disabled on July 1, 2000, due to heart problems, migraine headaches, high blood pressure, obesity, asthma, and eye problems. (R. 101,

112.) She has no past relevant work.

In 2000, Gilcrease underwent a sleep study due to excessive tiredness and snoring. (R. 158-160.) She was diagnosed with obstructed sleep apnea.

Medical records from Rapides Medical Center in July 2000 show that Gilcrease was admitted with complaints of chest pain radiating to the jaw and right arm. (R. 161-165.) She was released from the hospital with instructions to follow up with a stress test on August 2, 2000. The stress test showed a small reversible defect in the inferior wall and a small fixed defect at the apex. (R. 172.)

Rachel M. Harris, M.D., performed a consultative examination on March 24, 2001. (R. 181-183.) Gilcrease was 5'5" and weighed 340 pounds. Ambulation and range of motion were difficult due to her obesity. (R. 182.) Gilcrease had a normal gait, regular heart rate and rhythm, with 2+ pitting edema bilaterally. Her lungs had bilateral expiratory wheezing.

A residual functional capacity assessment was performed on April 18, 2001. (R. 186-193.) The physician found that Gilcrease could occasionally lift twenty pounds and could frequently lift ten pounds. She could stand and/or walk a total of about six hours in an eight hour workday, and could sit a total of six hours in an eight hour day. She had an unlimited ability to push/pull.

Gilcrease reported to the LSU family practice clinic on July

5

3, 2001, with complaints of pain in her back and knees. After physical examination, the doctor noted that Gilcrease was 5'2" tall and weighed 368 pounds. She had a continuing diagnosis of morbid obesity, hypertension, GERD, migraine headaches, and osteoarthritis. She was diagnosed on that day with tennis elbow and edema. (R. 296.) The doctor recommended a tennis elbow strap, and also recommended that Gilcrease undergo a dietary consultation and consider stomach stapling. (R. 297.) She returned to the clinic on September 4, 2001, complaining of leg pain. The doctor diagnosed edema and rhinitis. (R. 295.) Gilcrease was treated for migraine headaches, back pain, and TMJ at the end of September 2001. She was instructed to continue with a weight loss diet, and she was prescribed Flexeril and Motrin. (R. 292-293.)

By November 2001, Gilcrease was still having pain in her knees and also had pain in her right hip. She had gained more weight since trying to quit smoking. (R. 290.) She was informed that she needed to lose weight and quit smoking. She was prescribed Celebrex for pain. (R. 290.) Gilcrease returned to the LSU clinic in January 2002, with continued complaints of leg pain. (R. 288.) The doctor contacted the LSU surgery department in Shreveport to discuss bariatric procedures. (R. 288.) In March 2002, Gilcrease was smoking 3/4 pack of cigarettes per day. She was instructed to do exercises and water aerobics. (R. 414.)

Gilcrease was treated for chest pain in May 2002. (R. 312-

315.) In July 2002, Dr. Madden recommended a heavy duty wheelchair for Gilcrease because of her osteoarthritis and morbid obesity. (R. 311.) Gilcrease complained of dizziness in September 2002. (R. 307.)

Dr. Michael Madden completed a "Medical Assessment of Ability to do Work-Related Activities" on March 26, 2002. Dr. Madden noted that, due to osteoarthritis, Gilcrease could lift and carry a maximum of 20 pounds and could stand/walk a total of two hours in an eight hour day. (R. 301-302.) Due to osteoarthritis and morbid obesity, Gilcrease could sit a total of four hours in an eight hour day, could not climb, kneel, stoop, balance, crouch or crawl, and was limited in her ability to reach, handle, and push/pull. (R. 302.) Also, Gilcrease's morbid obesity prevented her from tolerating a hot environment. (R. 303.) Dr. Madden noted that Gilcrease was depressed, but still had a "good" ability to follow work rules, deal with the public, use judgment with the public, function independently, maintain attention, behave in an emotionally stable manner, and demonstrate reliability. (R. 304-305.) Madden noted that Gilcrease had "very good" ability to understand, remember, and carry out complex, detailed, and simple job instructions. (R. 305.) He found that Gilcrease only had a "fair" ability to deal with stress and maintain personal appearance. (R. 304-305.)

On February 24, 2003, Dr. Madden wrote a letter stating that

7

Gilcrease had multiple medical problems stemming from morbid obesity. (R. 332.) A cardiologist was unable to perform a stress test or angiogram because of Gilcrease's size. Gilcrease failed every attempt at weight reduction, and Madden referred her to a bariatric surgeon, as he saw that as Gilcrease's only possibility for long term survival. (R. 332.) Gilcrease was evaluated for bariatric surgery, but was turned down because her body mass index was 70. Gilcrease was told she had to lose fifty pounds in order for surgery to be safely done. (R. 352.) Dr. Madden suggested a very low calorie diet for six months as well as Meridia, a weight loss pill.

In September 2003, Dr. Madden suggested that Gilcrease attempt to cut down on smoking because she was smoking one pack of cigarettes per day. (R. 389.)

In October 2003, after the administrative hearing, Dr. Madden provided an updated medical source statement regarding Gilcrease's ability to do work-related activities. (R. 392.) Dr. Madden opined that Gilcrease could lift ten pounds occasionally and less than ten pounds frequently. (R. 392.) She could stand/walk less than two hours in an eight hour day, and could sit less than six hours in an eight hour day. (R. 392-393.) Dr. Madden noted that Gilcrease had a limited ability to push/pull with her lower extremities. (R. 393.) Dr. Madden found that Gilcrease could not climb, balance, kneel, crouch, crawl, or stoop. She could

occasionally reach and handle, and could frequently finger and feel.

James Quillin, Ph.D., completed a psychological evaluation on July 16, 2003. (R. 317-320.) Gilcrease reported a fair appetite, but low energy, and denied crying spells or suicidal thoughts. (R. 317.) She was taking Wellbutrin, prescribed by her primary care physician. Gilcrease was alert, friendly, and cooperative. She was in a wheel chair and weighed approximately 375 pounds. (R. 317.) She was oriented, had good attention and concentration, and good memory. She had developed depression secondary to her medical problems. She had no evidence of psychosis, but her mood was moderately depressed. (R. 318.) He found that her condition was impaired and that treatment of her depression was needed. (R. 318.) Dr. Quillin found that Gilcrease had no limitations in her ability to understand, remember, and carry out functions. Quillin opined that Gilcrease was moderately limited in her ability to respond to supervisors, co-workers, and the public.

An internal medicine consultative evaluation was performed on August 20, 2003, by Riaz Masud Chaudry, M.D. (R. 321-331.) Gilcrease reported to Dr. Chaudry that she has been overweight for most of her adult life, and that her last weight was 378 pounds. (R. 321.) At age 18, she weighed 250 pounds. She developed high blood pressure, gastric reflux, and osteoarthritis. She has edema in her lower extremities and leg pain. Dr. Chaudry noted that

Gilcrease was "massively obese" and "wheelchair bound." (R. 322.) Gilcrease had edema, but no clubbing, cyanosis or jaundice. Chaudry issued a diagnosis of morbid obesity, history of hypertension, history of gastric reflux, chronic migraine type headaches, and history of osteoarthritis. Chaudry opined that Gilcrease's medical problems were mostly related to her obesity, and her ability to work was severely limited due to her weight problems. (R. 324.) It would be difficult for her to be employed in an occupation that required bending, stooping, or lifting heavy weights. (R. 324.) Chaudry opined that Gilcrease could lift fifty pounds occasionally and ten pounds frequently, could stand/walk at least 2 hours in an eight hour day, could never balance, kneel, crouch, or crawl, and could occasionally climb and stoop. (R. 326.)

## Legal Analysis

Issue No. 1: Whether the Commissioner erred in failing to obtain a medical advisor to determine the onset date of the claimant's depression.

Gilcrease was awarded benefits from July 11, 2002, but not before. (R. 24-25.) She argues that the question of when her depression became disabling is a medical question unsuited for resolution by the ALJ. Gilcrease claims that the ALJ should have obtained the testimony of a medical advisor to determine the onset date of her depression. However, the ALJ never found that

10

Gilcrease was disabled due to depression, regardless of when it developed. The ALJ found that Gilcrease's depression was not disabling, either alone or in combination with her other impairments. (R. 25.)

Gilcrease had the burden of proving that she had disabling depression, and she failed to point to any evidence in support of that claim. The record reflects that Gilcrease received minimal conservative treatment for depression. She took Wellbutrin, prescribed by her primary care physician. (R. 151, 317.) She was not hospitalized for depression, she was not treated by a psychiatrist, and she neither sought nor received any counseling. (R. 478.) When applying for disability, Gilcrease did not list depression as a condition precluding her from working. (R. 112.) Furthermore, she did not testify that depression prevented her from working. (R. 474.) There is no evidence in the record that depression contributed to or caused Gilcrease to stop working. See SSR 83-20. The record contains substantial evidence supporting the Commissioner's decision that Gilcrease's depression was not disabling. Since the depression was not a disability, there was no need for the ALJ to determine an onset date, with or without a medical advisor.

Issue No. 2: Whether the Commissioner erred by posing a defective hypothetical question to the vocational expert.

Gilcrease argues that the ALJ's hypothetical question to the VE was defective because the ALJ did not list her impairments in the hypothetical. Specifically, Gilcrease submits that "[i]n the instant case, the posited hypothetical questions are fatally flawed because the ALJ did not include *any* of Plaintiff's 'recognized' impairments or disabilities." (Doc. #12, p.8.) That is not the case.

A hypothetical question to a VE is deemed defective and in error unless (1) the assumptions reasonably incorporate all of the disabilities recognized by the ALJ, and (2) the claimant is afforded the opportunity to correct deficiencies in the ALJ's question. See Brown v. Barnhart, 285 F. Supp. 2d 919, 933 (D. Tex. 2003) Boyd, 239 F.3d at 707; Bowling v. Shalala, 36 F.3d 431, 437 (5th Cir. 1994). In this matter, the ALJ called on a vocational expert ("VE") to testify regarding the types of work the claimant might be capable of doing. The ALJ asked the VE to consider a claimant like Gilcrease with the residual functional capacity to perform sedentary work that does not require:

1. pushing or pulling with either the upper or lower extremities;
2. climbing of ladders, ropes or scaffolds;
3. balancing;
4. kneeling;
5. crouching;
6. crawling;
7. only occasional climbing ramps and stairs; and
8. only occasional stooping.

The ALJ incorporated the following additional limitations:

12

9.  Slight limitation in the ability to make judgments on simple work-related decisions;
10. moderate limitations in the ability to interact appropriately with the public, supervisors, and coworkers;
11. moderate limitation in the ability to respond appropriately to work pressures in the usual work setting; and
12. moderate limitation in the ability to respond appropriately to changes in a routine work setting.

(R. 490-491.)

In the first hypothetical presented to the VE, the ALJ incorporated the above twelve recognized limitations. It is obvious that the physical limitations (1 through 8, above) are based on the physical disabilities recognized by the ALJ: coronary artery disease, migraine headaches, osteoarthritis, and morbid obesity. The additional non-physical limitations (9 through 12, above) are based on Gilcrease's depression. (R. 24, 319, 320.)

While Gilcrease claims that the hypothetical failed to incorporate *any* of her disabilities, the opposite is true. The twelve assumptions listed above incorporate *all* of the disabilities recognized by the ALJ. The hypothetical posed in this case is the same type of question used by countless ALJs. See Boyd v. Apfel, 239 F.3d 698, 707 (5th Cir. 2001)[1]; Abrams v. Barnhart, 2004 U.S.

---

[1] In Boyd v. Apfel, 239 F.3d 698, 707 (5th Cir. 2001), the hypothetical question posed by the ALJ focused on Boyd's problems in memory and concentration ("assume that... this man has such disturbance to the extent that his... concentration or memory is limited, so that if he does work, he's got to work in a simple, one or two-step-type jobs . . . can understand simple instructions, and . . . can stay on task a full eight hours, but he does not have to think about things too much, just repetitive-type work?"). Id. However, the information received after the

13

Dist. LEXIS19499, 31 n.6 (E.D. La.) (Assumed claimant with prior unskilled and semi-skilled work, who could perform light work, limited ability to socially function in an appropriate manner, and no extensive interaction with the public.); Maes v. Apfel, 2000 U.S. Dist. LEXIS 21689, 58, 59 (N.D. Tex.) (Assumed claimant with limited reading/writing abilities, who could only follow simple instructions, and had limited interaction with the public.); Callais v. Apfel, 2000 U.S. Dist. LEXIS 14417, 24 (E.D. La.) (Assumed claimant capable of performing medium work with the following restrictions: avoid environment with extreme heat, fumes, dust or industrial toxins, also avoid uneven surfaces, heights, and moving machinery.). An ALJ does not have to list the disorders in order for the hypothetical to be proper. For example, the ALJ does not ask the VE to assume a claimant with coronary artery disease, migraine headaches, osteoarthritis, and morbid obesity. Rather, the ALJ asks the VE to assume a claimant with various physical and nonphysical limitations such as the twelve listed herein. The hypothetical in this case reasonably incorporated all of Gilcrease's disabilities and was not defective.

Not only must the hypothetical by the ALJ incorporate

---

hearing showed that Boyd was also significantly limited in his ability to deal with people, to deal with ordinary work stresses, and to function independently in daily activities. The court did not find that the hypothetical was defective because it did not state the disabling illnesses. Rather, it was defective because it did not incorporate all of the disabilities.

reasonably all disabilities of the claimant recognized by the ALJ, but the claimant or his representative must be afforded the opportunity to correct deficiencies in the ALJ's question by mentioning or suggesting to the vocational expert any purported defects in the hypothetical questions. See Boyd v. Apfel, 239 F.3d 698, 706-707 (5th Cir. 2001), citing Bowling v. Shalala, 36 F.3d 431, 436 (5th Cir. 1994). Here, Gilcrease was represented by a non-attorney representative at the hearing who was provided an opportunity to ask questions or correct any perceived deficiencies. (R. 188.)

Because the hypothetical incorporated reasonably all disabilities of the claimant recognized by the ALJ, and because the representative was afforded the opportunity to correct deficiencies, the hypothetical was not defective.

Issue No. 3: Whether substantial evidence supports the finding that, prior to July 11, 2002, the claimant could perform other work.

Gilcrease argues that the ALJ erred in finding that she could perform other or alternate work. The ALJ concluded that Gilcrease could perform sedentary jobs such as check cashier, service clerk, and information clerk. However, Gilcrease argues that those are all semi-skilled jobs. She claims that the VE failed to identify any transferrable skills, and therefore, the ALJ could not have found that Gilcrease could perform semi-skilled work.

15

Gilcrease argues that the court should find her disabled as the court did in <u>Albritton v. Sullivan</u>, 889 F.2d 640, 642 (5th Cir. 1999). In that case, the ALJ found the claimant was approaching advanced age, that the transferability of his skills was "non material," and that he had a marginal education. As a result, the ALJ found Albritton was not disabled per Rule 202.10. The Fifth Circuit reversed because Rule 202.10 required literacy, and Albritton was illiterate. Here, while Gilcrease has no transferable skills, she has a high school education.

A high school education means abilities in reasoning, arithmetic, and language skills acquired through formal schooling at a 12th grade level or above. Generally, a person with those educational abilities is able to do semi-skilled through skilled work. 20 C.F.R. §416.964(4). It is undisputed that Gilcrease has a high school education. She also spent two years in trade school learning industrial electronics. (R. 118.) Her hobbies consist of electronics and computer repairs. The VE testified, "Your honor, the reason I went with semi-skilled jobs is because she did recently complete a full curriculum in industrial electronics which showed that she has - - even though she had not worked at, in an SGA situation, she does have capabilities... intellectually." (R. 482.) Thus, there is substantial evidence in the record to support the ALJ's determination that Gilcrease could perform semi-skilled work based on her education.

Furthermore, while Gilcrease argues that she should be found disabled based on Rule 202.27, reliance on the grids alone is not appropriate here. Use of the Medical-Vocational Guidelines alone is not appropriate when the claimant has non-exertional limitations. See Carey v. Apfel, 230 F.3d 131 (5th Cir. 2000), citing Loza v. Apfel, 219 F.3d 378, 398 (5th Cir. 2000). Gilcrease had several non-exertional limitations considered by the ALJ, such as difficulty making decisions, responding to work pressures and difficulty in performing the manipulative or postural functions of reaching, handling, stooping, climbing, crawling, or crouching. 20 C.F.R. §404.1569a.

Finally, even if Gilcrease could not perform semi-skilled work, the VE testified that she could perform other sedentary, unskilled work, such as an assembler. (R. 485.)

After a review of the entire administrative record and the briefs and exhibits filed by both parties, and pursuant to 42 U.S.C. §405(g), I find that there is substantial evidence in the record as a whole to support the Commissioner's decision that Gilcrease was not disabled prior to July 11, 2002, and the decision is consistent with relevant legal standards.

## Conclusion

Based on the foregoing discussion, IT IS RECOMMENDED that Gilcrease's appeal be DENIED AND DISMISSED WITH PREJUDICE.

## Objections

Under the provisions of 28 U.S.C. § 636(b)(1)(c) and Fed.R.Civ.P. 72(b), the parties have **ten (10) business days** from service of this Report and Recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within **ten (10) days** after being served with a copy thereof. A courtesy copy of any objection or response or request for extension of time shall be furnished to the District Judge at the time of filing. Timely objections will be considered by the district judge before he makes a final ruling.

**A PARTY'S FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS, CONCLUSIONS AND RECOMMENDATIONS CONTAINED IN THIS REPORT WITHIN TEN (10) BUSINESS DAYS FROM THE DATE OF ITS SERVICE SHALL BAR AN AGGRIEVED PARTY, EXCEPT ON GROUNDS OF PLAIN ERROR, FROM ATTACKING ON APPEAL THE UNOBJECTED-TO PROPOSED FACTUAL FINDINGS AND LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT JUDGE.**

THUS DONE AND SIGNED at Alexandria, Louisiana, on this ____ day of March, 2006.

JAMES D. KIRK
UNITED STATES MAGISTRATE JUDGE